in 20543, Frye v. Anadarko. Mintz? Mintz, Your Honor. Mintz, yes. May it please the Court? The trial court erred in dismissing this case, and this appeal arises from both claims that the court dismissed. The first error was the court's finding that Lea Frye did not plausibly allege constructive discharge. The second error was determining that the facts as presented did not present a justiciable controversy under the Declaratory Judgment Act, and I would like to address those in that order. In dismissing Lea Frye's Dodd-Frank claim, the court determined a few things. First, that her factual allegations were not sufficient. In reaching that conclusion, the court erred in two ways. First was in its approach, and second was in the findings. The approach the court took was to analyze the factual allegations supporting constructive discharge as separate, discrete acts and not a continuing action that needed to be evaluated in its totality. Well, now, you're a good lawyer. You're starting with what I would have thought is the strongest argument, that the constructive discharge forces the context all the way back, but address the waiver problem. Where specifically in the record did you argue that constructive discharge incorporates all prior? In the complaint, Frye alleges, Your Honor, that her constructive discharge was the incremental effect of all of the retaliation, beginning with her internal opposition and her internal complaint to her supervisor, and continuing after she filed her SEC complaint. I thought you were telling Judge Vance, we get retroactive protection, not, oh, well, she's been retaliated for conduct after she became a whistleblower because the retaliation is a constructive discharge, hence, look at everything before. Those are two quite different arguments, and you're saying when we look at Judge Vance's decisions, we'll see discussion of continuing violation? Yes, Your Honor. What you see is, and I want to be clear, the complaint alleges with particularity. I'm sorry. Judge Rosenthal. Yes, Your Honor. Thank you. The complaint does allege with particularity that this was a pattern. And in our hearings leading up to the ultimate outcome — Right. But it was — there's — you're being nice to nod and push back if I'm wrong, but you were saying pattern, hence, look retroactively at those earlier incidents. Or were you saying it's a single set of retaliation culminating in intolerable world? It's the latter. Okay. And — and digital realty supports that construction and supports why that is a valid claim, because in digital realty — Before you can get to it, that may be right under digital realty. It's really did you Not expressly in terms of citing, for example, the doctrine or the Supreme Court case law. However, we don't think the waiver argument has merit, because the question is, was it sufficiently before the Court for her to rule on it, and that the — the articulation of this being the product of a pattern of treatment was — was part of this case from the outset. And in fact, she ruled on that basis, saying that whether there was a pattern or not It's our best case that a continuing violation doctrine applies outside of statute of limitations. Because if there isn't one, it's pretty — it's asking her to be awfully prescient to see that as the exception to digital. Your Honor, I think it's both Morgan and Souters cited in our brief, but it's also digital realty, because digital realty departs from some of the other employment laws in several ways. One is its construct of what conduct is protected and how the — the Supreme Court said, we don't want you, the employee, to have a proof problem. We don't want you to have to prove that this retaliation was solely because of your SEC report. After all, many times the employer won't know of the SEC report, and that would allow the employer to actually use its earlier retaliation as a defense. And so the hypotheticals that this Court posits in Asadi and that the Supreme Court uses in its opinion in digital realty both contemplate exactly that. And it's the Court's verbiage where the Supreme Court, to be clear, says, we want to dispel whistleblowers of a proof problem. And that proof problem was one that came up when Summers, the plaintiff in the underlying case in digital realty, said, hey, if you read it the way digital realty wants you to read it, then attorneys and auditors who must report internally first, they're going to have no protection. The Court's response to that was correct until they go to the SEC, at which time this shields not only their SEC report, but also their earlier reports. After all, the employer may not have even known about the SEC report. I know that's the argument. It's a little — the proof problem issue is a little confusing to me. But if — if — if the retaliation occurs before the individual sends something to the SEC, the retaliation under digital couldn't be for whistleblowing. That's right. And to be clear, there — there are points we can see that could help the analysis here. For example, the issue in digital realty was, need a whistleblower first go to the SEC to have protection by Dodd-Frank. That was something that was the subject of spirited disagreement among the circuits. Ultimately, the Court said, yes, you must go to the SEC, or you are not within the category protected by this statute. We concede that. We concede, for example, Your Honor, that if Lea Fry had never gone to the SEC before the date of her constructive discharge, she wouldn't have a claim. That was the fact pattern in Asadi, and it was the fact pattern in Summers. Neither of them had actually gone to the Court. But — and had she simply complained internally and then been fired or constructively discharged, as it were, she would have been left with Sarbanes-Oxley as her only remedy, and the digital realty opinion discusses that. But once she reported to the SEC, which happened during her employment, she then had the broad protection of the Dodd-Frank Act. That broad protection doesn't require her to prove whether her retaliation was because of her SEC complaint, her earlier complaints, or both. And that's the argument, Your Honor. If we don't accept that there's any retroactive look, so it's just the nine days, do you lose then because there's really no economic harm? We may. We obviously are arguing for a little bit different reading than the courts have taken as to the non-economic damages. But obviously, it's a much tougher case, and we conceded that to Judge Rosenthal. However, we do think that that would take away the protections in many ways that this statute was intended to create. In other words, why wouldn't an employer in all instances feign ignorance about the SEC complaint and say, yeah, we might have retaliated, Sarbanes-Oxley limitations periods run? Sure. We didn't like those internal complaints, so we fired her based on that. And I think — They can't feign ignorance. She gets protection the minute she goes to them. I thought the underlying logic from our original Asadi decision and then Supreme Court is, the encouragement is to get her to report. The second she reports, even if the retaliation is for internal reporting, she's protected. It's just here she delayed. And so on a simplistic reading of digital, then you just can't look back to the — the retaliation prior to that bright line. And that's Anadarko's argument. But there is no such temporal line drawn in the protection. In other words, the way we read the statute is that it is a — it is a narrow and very specific class that's whistleblowers. And the Court says, we are breaking this statute into two discrete parts. One, who is protected? You must report to the SEC to be a whistleblower. But the second, Your Honor, is a broader — it's a — the second discrete part is, what is the breadth of that protection? And the breadth — Your second issue — It's unusually broad, I concede. Yeah. Under MedImmune, you think that the letters that your client was sent were sufficiently concrete to establish justiciability? I do, Your Honor. And I don't think it's solely because of MedImmune. And I don't think it's solely because of the letters. And here's what I mean by that. It's true that there is this Fifth Circuit case called Vantage Trailers that Anadarko cites that says threats alone aren't enough. It is not the case, however, that that opinion did away with Oryx. Oryx is the opinion that says threats can be enough if sufficiently specific. I think what Vantage Trailers was getting at and why it's so distinguishable here is that threats by themselves without factual ripeness are not enough. In Vantage Trailers, you had an unsettled patent design, and the facts weren't ripe. So the Court said threats alone aren't enough, but went on to say that those threats made in Vantage Trailers weighed decidedly in favor of a justiciable controversy, and then the Court decided the case on the facts. There's a reason, I think, that Anadarko doesn't cite to Oryx much. We have not only threats here. We have a dispute over a contract. It's clear what we're fighting about. It's the nondisclosure agreement. It's clear what Ms. Frey wants to disclose, and that's her SEC letter. Just the letter. Just the letter and its attachments. I think it's 107 pages. And that has always been crystal clear, dating back three and a half years. And we know this because Anadarko's letter in July of that year, which is Exhibit 6, I believe, to the Second Amended Complaint, says we know you want to disclose the SEC letter. We prohibit it. We prohibit disclosure to the Edgar plaintiffs because there was another securities fraud case going on. We prohibit to any third parties. And we deem all of it to be our confidential and proprietary information. What's the basis of jurisdiction for declaratory judgment action? I'm sorry, Your Honor, I didn't catch the question. I'm sorry. I have a cold. I sound ridiculous. But, I mean, more ridiculous than usual. But what's the basis for jurisdiction if the Dodd-Frank claims are out under your allegation that there's a declaratory judgment action that should have survived? I think we just assert pendant jurisdiction. I don't think it has stand-alone jurisdiction. What about that? Nothing to pin to. If the Dodd-Frank, if the Dodd-Frank, we did not allege, for example, diversity arising solely from the declaratory judgment claim because we didn't think we could. So you're not alleging diversity. No. Not as to that claim. Is there diversity? There is diversity of the parties. We didn't allege that there was $75,000 in issue as to solely the declaratory judgment claim, Your Honor. Do you need to? Do we need to? I don't think so. Well, in any event, it's an issue of subject matter jurisdiction that we'd have to deal with if it came up. And you're talking, Your Honor, if I understand your question, if the Dodd-Frank claim is dismissed. Yes. Yes. Talking about an independent base of jurisdiction. So your answer is if Dodd-Frank argument is, if it was properly dismissed, then it's a tricky jurisdictional circumstance that would depend on diversity that the record reflects does exist, but the difficult issue would be amount in controversy? Is that where you're leading us? Yes. We had, at the time we filed this lawsuit, a client who'd been threatened with a lawsuit. And what we did not want was a judicial admission, for example, that there's at least $75,000 in issue solely in that case. So it's attached by design to the Dodd-Frank claim. And I'd have to go back and look at the complaint. I don't want to make a misstatement, but I don't want to make a misstatement. Did either party brief this issue? I'm sorry? Either of you briefed this? It has not come up as part of the case, no. And nor was it, as I recall, a part of Judge Rosenthal's order or her reasons for dismissal. Your answer was also supplemental jurisdiction, 1367? Yes. And possibly diversity? Yes. And so the Court found a lack of ripeness, if I may continue on the declaratory judgment claim, since I've only got a few minutes left. The Court found a lack of ripeness based on precisely the kinds of things that Justice Scalia in Metamune say do not undermine ripeness. For example, contingencies controlled by Anadarko, the fact that we don't know whether Anadarko would sue Ms. Frye, those are not the kinds of contingencies that undermine ripeness. We have facts that have always been clearly settled. And Anadarko has, through good luring, gone to great lengths to call things hypothetical that really are not. One example is they say, well, first she wanted to disclose the fraud in the context of a pending securities fraud lawsuit. But that's really outside the analysis. That was a product of serendipitous circumstance. Leah Frye found out in May of 2017 that $700 million had been written off because of this project. She realized that she had been right all along, that there had been fraudulent representations, that all of the mapping that they'd been told to do that was a fraud had allowed them to percolate this narrative, and here we are now writing it off a year later. That's why she waits a year to file the lawsuit. Well, at the time she learns this fact from Anadarko's public filings, she also learns of a securities fraud lawsuit pending in Houston. And so she sought, hey, I want to tell the shareholders what's going on. She asked Judge Rosenthal for the opportunity to have Judge Rosenthal rule on whether she could share this same document, the SEC letter, with the Edgar shareholders, who, by the way, had a securities fraud case that was smaller and arose from facts far less egregious than those Ms. Frye alleges. How is the sharing going to be accomplished? I'm sorry, Your Honor? How is she going to share this with the stockholders? It was clumsy, to be sure. We asked Judge Rosenthal to allow us to appear at a status conference and rule as to whether this could be disclosed, and she treated that, I think, probably appropriately as an advisory opinion that she couldn't issue. And so that laid the groundwork for Ms. Frye to seek it, in this case, Your Honor, to seek a declaratory judgment. And so the target has always been shareholders, and that's been the case from the outset. And Anadarko saying, well, it can't be this shareholder, or first it was this shareholder and then it was that, really doesn't address the real issue, which is, can it be disclosed to anyone? Anadarko says no. Frye says, this isn't your proprietary information. This is fraud. And by the way, much of it was already publicly disclosed by Anadarko. Thank you very much, counsel. Mr. Emery. May it please the Court. My name is Mark Emery. I'm here on behalf of Anadarko Petroleum Corporation. The judgment below should be affirmed. Judge Rosenthal provided Ms. Frye two opportunities to replead this complaint. First to overcome some deficit in factual allegations, and then to address the digital realty decision. And even after two amended pleadings, Ms. Frye was unable to state a claim for retaliation under the Dodd-Frank Act. Judge Rosenthal correctly dismissed that claim, and also correctly dismissed the declaratory judgment claim on the grounds that it was non-justiciable. I'd like to start with the retaliation issue, but certainly would like to talk about the declaratory judgment as well. Your Honors, this Court was the first one to get the Dodd-Frank retaliation statute right in the Asadi decision, and the Court's reasoning in that case was subsequently affirmed by the Supreme Court in digital realty. The Court should not be the first one to get the statute wrong by adopting a flawed interpretation of what it does. What the Court did correctly in Asadi, and what the Supreme Court has now done to correct our interpretation of the statute, is to interpret it by its threshold requirement, that is, that a Dodd-Frank whistleblower is just that, a whistleblower as defined by the statute. And so one is not entitled to the statute's protections until one has actually become a whistleblower. But her argument is, and you don't dispute, that she was a whistleblower at the time she resigned. That's correct. Okay. And she says she resigned because it got intolerable. And in constructive discharges cases, we don't ignore — we look at the entire past to present to decide if the conditions had gotten so intolerable. So is your position that we should ignore the doctrine that we apply to these circumstances? The Court — so Ms. Frey has cited cases from largely the Title VII context on how constructive discharge works, particularly a continuing violation theory, which is applicable in a statute of limitations context. Yes. That is contrary to the statute here. First of all, she's — first of all, I would say she has not cited a single case in which this body of law, the continuing violations law, has been applied in the Dodd-Frank context. So the Court would have to cut some new ground to do that. But second, the Court should not do that because it's contrary to how the statute works. And I would note one thing, that in the opening argument and even largely in the briefs, there's very, very little mention by Ms. Frey of the Sarbanes-Oxley statute. I think it's very important to understand on this issue of how the Sox statute and the Dodd-Frank statutes interact. If you look at page 952 in the record, there's a declaration from Ms. Frey where she notes that the fraud — that she knew of fraud as early as March 2014, yet she didn't become a whistleblower under Dodd-Frank until May of 2016. This is just — this is just what the Dodd-Frank statute is not — is trying to avoid. It's trying to incentivize early reporting to the SEC. But it's also important to note that all along during the — during the lead-up period to when she finally did decide to go to the SEC, she could have had protections if she had timely asserted her rights under the Sarbanes-Oxley statute. By making disclosures under that statute, she was entitled to go to the Department of Labor within the 180-day statute of limitations and then to proceed from there and, if possible, to go and file a suit later. She didn't do that. So it's not as if she's — there was never any remedy existing for any kind of retaliation that she alleged that she experienced in the interim. To be — What I'm pressing on is that, you know, when you say we got it right once, don't get it wrong here, it doesn't — it's not clear to me that digital reality or even any of the cases all you're citing dealt with circumstances like this. Those were placed — plaintiffs that get fired then report. That's in the digital reality world. But I don't see you pointing to a case where it became whistleblower, then further acts made it that much more intolerable, and yet the Court can't look to the earlier acts to decide whether the final retaliation — see, that's the slightly unusual posture of this case. I understand that, Your Honor. And is your answer, first, that they never made that argument to Judge Rosenthal or not? Well, yes, the Court is rightly concerned about the waiver of this issue. You can look through the entire 1,100-some pages of the record and never find a single reference to the continuing violation theory. It's also a really — it's incorrect to say that Judge Rosenthal actually ruled on this issue. All the Title VII law that was — that's now asserted in the briefs is not a part of Judge Rosenthal's decision-making. But to get back to the prior question, the precedent that matters here is digital reality. And digital reality said everything that the Court needs to affirm on the retaliation issue. It said that Mr. Summers was not a whistleblower and not entitled to relief under Dodd-Frank because he was not a whistleblower at the time of the retaliation. And that — and that's completely material in this case, too. If you were to look through Ms. Frye's complaint, look at Allegation 1, Allegation 2, Allegation 3, everything — everything that you could line up prior to May 9th, the answer is the same under digital reality, that there was no — that there was — that she was not a whistleblower at the time of the retaliation, therefore she's not entitled to the statute of protections. What's your understanding of how she would make this information public to the shareholders, that she's trying to get you to agree that it would not be bound by the nondisclosure employment contract? I don't think she's ever made that entirely clear to us yet, no. I think that the reason why there's never been an actual dispute that's appropriate for resolution under the Declaratory Judgment Act is we've never even had the crucial details of what this disclosure would be, when it would happen, what it would involve. I think even once we knew those facts, I think it would be appropriate for us to be able to assess that, to assess what the potential damages were, whether there's some kind of alternative way to resolve it, something like that. But this case has never come close to there being an actual dispute that's immediate and real. She has. I mean, she's saying how it doesn't — she says she will disclose it immediately, and she has told you what. It is the letter. So — I would — I would dispute that, Your Honor. I mean, I know that, you know, Mr. and Mrs. held up a binder here that says this is all we're disclosing, but it's — but it's important to actually look into the details of what's in the SEC letter. And I'm not going to read from it here, since these are materials under seal, but I — but, I mean, look at — look closely at page 841 in the record, okay? This is near the end, and importantly, she makes herself available for a meeting, requests a meeting to talk about this, says that there's additional information that's available, and even drops a footnote at the end that says, oh, and by the way, I have information about other projects, too. So the SEC letter is not circumscribed in any — in any reasonable manner. It really kind of has a sort of Trojan horse effect. And even if the representation is that all we're going to give is the SEC letter, I think we have a very reasonable basis to believe that there's — that there's a lot more that we need to know before there can be a proper assessment, even of — even of how this would be resolved, so that we're not — we're not at this stage yet. The letter said it is protected, and we will enforce our agreement. That seems pretty determinative. Are you referring to the July 6th? Yes. Yeah. I would say then that the — again, this is in the context of Ms. Fry saying she wanted to disclose the SEC letter. All of the concerns that I just described were concerns at that time, that there are a bunch of sort of open-ended promises there. We believe that the nondisclosure agreement prevents at least some, if not all, of those disclosures. And to that extent, we may want to follow on with a lawsuit, but I — but it's so — it's so far premature from being able to — being able to make that — that kind of an assessment at this point. So it doesn't sound like you're in any position to even try to negotiate some sort of settlement if you don't really know what's at stake? With respect to a future disclosure? At this point, absolutely not. There — I'm just not faxing — Well, future — possibility of future disclosure versus you pay her money, a regular settlement, and then it goes away. Has any of that ever been discussed? That — a monetary term has not been discussed. I mean, in contrast to some of the other — you know, some cases, for example, that have been cited, like the O'Sullivan case, where there's a liquidated damages provision, there's nothing like that in this case in the nondisclosure agreement. And so, you know, I'm not going to rule out there certainly could be some kind of a negotiated arrangement, a controlled disclosure, where the terms, you know, we can look through and look at what, you know, what's our — if anything's already been made public, things like that. So — but I think that, you know, what I want to underscore is that none of these things have happened yet, so we're just not looking at an actual dispute. I'd like to address very quickly the jurisdictional issue that the Court brought up, because I am, you know, looking at the complaint, and again, I'm not going to read from this directly, but I think Mr. Menzies, you know, made the correct representation that there's not — there is no allegation regarding the amount of controversy. So I think that this would pose an obstacle to diversity of jurisdiction over this issue. As far as pendant jurisdiction, I don't really see what the pendency would be here, you know, and, you know, in contrast to a question — an open question about the justiciability under the Declaratory Judgment Act. Thank you, Counsel. Your Honor, the complaint expressly, several times, describes — and I may grab it in a moment if you have questions — but describes how this is a continuing pattern of retaliation. It expressly links the constructive discharge to all of that, and that is precisely the kind of hypothetical this Court discusses in Asadi, in other words, that your internal — your internal complaints will be protected once you become in the category of whistleblowers. And I would urge this Court to look closely at page 780 of Digital Realty, because in rejecting — this case presents irony in that we are the plaintiff aligning ourselves with the arguments made by the defendant in the underlying case. But the plaintiff in the underlying case said you cannot read it the way the defendant wants you to read it because you'll jettison protection for attorneys and auditors. They always have to complain internally. Did you give Title VII case law to Judge Rosenthal? Did you give the Title VII case law about a continuing violation? We cited — we cited Morgan and we cited Souters. And the reason we cited the cases we did, along with Stewart and Heath from this Court, is because the continuing violation doctrine is treated as a generic feature of an employment law. That's in our briefing. It's not unique to Title VII. And so Judge Rosenthal was aware that we had this pattern of behavior. The question was, in the wake of Digital Realty, where — what do I consider as the Court? And the Court expressly says, I will not consider anything before the SEC complaint. And in doing so, the Court drew a temporal line and created a proof problem when, on page 780 of Digital Realty, the Court hoped to alleviate that proof problem. I want to switch to declaratory judgment really quickly. Your Honor, the arguments we continue to hear are — are good lawyering, but we're trying to manufacture a hypothetical situation that is not hypothetical. They have known for two and a half years exactly what Ms. Frey wants to disclose. As we told Judge Rosenthal, what happens after the court rules, if the court rules, she can disclose the SEC letter, is really tangential to the proper analysis. Do you, Anadarko, know what she wants to disclose? The answer is yes. The purpose of her declaration, which, by the way, I guess Anadarko maintains as their confidential information as well, the purpose of that was to make it very clear that the only reason she hasn't disclosed it is because of the coercion that arises from those threats to sue. And those aren't reservation of rights letters. They do use that verbiage. But they also refer to a breach. They say, we will take action. They say they reserve rights, and they mention breach, and they at least intimate money damages. They have said that all 107 pages of that SEC letter is their confidential and proprietary information. And repeatedly, we said to Judge Rosenthal, please challenge this. For example, how can press releases saying this is a $2 to $4 billion net opportunity, how is that confidential if they've put it out there for the public to consume? Things were on the Internet. There were investor conferences where they said this is going to be 800 million barrels of oil. And they continued to do that after their scientists, including Ms. Fry, who was the team lead on the project, after they pushed back to such a degree that Anadarko has an internal police force that's a colloquialism called the RCT, Risk Consideration Team. I can't remember the C, and I'm sorry. But they're there to come in and say, hey, if we're getting a little overzealous on the exploration side, come to us. We will set the record straight, and we will bring a neutral set of eyes to this. And you know what they said? You're overstating the size of this oil field. You're overstating Shenandoah, and here's the real number you should use. They all pushed back. The scientists all pushed back. We challenged Anadarko repeatedly, tell us it can't be that every single part of the SEC letter is protected because a lot of it's already been disclosed publicly. It can't be that a nondisclosure agreement protects fraud. So tell us, tell us what do we need to redact? At one point, in one of their briefs, they identified three items, three items that they thought in that letter were protected. Now, of course, they've always maintained that the entire letter is their property, but we redacted those three items and sent it to them and said, okay, if we pull these three out, can we then make a deal that Frye can disclose the SEC letter? And they said no. And what that clarifies is why the only relief, the only options Frye has are exactly why the Declaratory Judgment Act exists. She can quit and go home, give up. She can just give the SEC letter to a shareholder and hope for the best, or she can seek judicial intervention in a situation where the facts are settled and ripe for review. Thank you. Thank you, counsel. The case is submitted. And we, that concludes this sitting. Thank you.